## NOAH v. NOAH.

1. Deeds—Delivery in Escrow.

　　Where grantor, after executing a deed, left it with the attorney with instructions to deliver it to the grantees in case of his serious sickness or death, and shortly before his death it was delivered to them and recorded after his death, there was a valid delivery in escrow.

2. Same—Consideration—Husband and Wife.

　　Where a brother, prior to his marriage to his fourth wife, executed a deed in favor of his brothers and sister and delivered it in escrow, and after his death it was disclosed that he was obligated to one of the grantees in a large amount, there was a valid consideration for the deed.

3. Husband and Wife—Antenuptial Conveyances—Fraud.

　　Where grantor, who was in ill health, was under moral and legal obligation to his brothers and sister, named as grantees in a deed executed and delivered in escrow over 11 months before grantor's marriage, it cannot be said to have been given with intent to defraud his future wife, in the absence of testimony that he made any representations to her as to his property.

4. Same—Dower—Good Faith.

　　As to antenuptial conveyances made in good faith, the general rule is that such a conveyance will defeat a claim for dower.

Appeal from Wayne; Bell (Frank A.), J., presiding. Submitted January 18, 1929. (Docket No. 48, Calendar No. 34,100.) Decided March 29, 1929.

Bill by Olga Noah against Charles W. Noah and others to set aside conveyance of real property. From decree for defendants, plaintiff appeals. Affirmed.

As to whether a conveyance of property in contemplation of marriage, but before negotiations for marriage have been begun is a fraud on the subsequent husband or wife, see annotation in 9 L. R. A. (N. S.) 955.

*Lightner, Oxtoby, Hanley & Crawford,* for plaintiff.

*Colombo, Colombo & Colombo,* for defendants.

FELLOWS, J. Fred Noah was married four times. By his first wife he had a son named Othmar. His first wife died when this boy was three weeks old, and he was brought up in the home of his grandparents. He became blind, and died when a little over 23 years old. His care largely fell upon defendant Clara Noah Ryan, sister of Fred, who was then at home. After he became blind, defendant Edward P. Noah, brother of Fred, gave him much attention. Defendant Charles W. Noah was also a brother of Fred. He seems to have been the most successful of the three brothers in a business way, and Fred worked in his store as a bookkeeper for many years. May 22, 1925, Mary, Fred's third wife, died. Fred was then in ill health; on June 17th following, Fred went to an attorney's office, executed a deed of a duplex owned by him on Helen avenue in the city of Detroit to the defendants, and left it with the attorney with instructions to deliver it to them in case of his serious sickness or death. On May 28, 1926, Fred married plaintiff, who was some 20 years his junior, and they lived in one of the apartments until his death September 7, 1927. Shortly before his death the deed was delivered to the grantees, and was recorded after his death. Plaintiff files this bill alleging that she became engaged to Fred on June 3, 1925, before the deed was executed; that it was never delivered, was without consideration, and was made to defraud her of her rights as wife of deceased.

1. We are satisfied that there was a valid delivery in escrow of the deed in question. With the citation of an abundance of sustaining authorities,

it was said by Mr. Justice Brooke, speaking for the court in *Loomis* v. *Loomis,* 178 Mich. 221:

"This court has consistently held that, where a grantor makes a deed to another and deposits the deed with a third party to be held by such third party until the grantor's death and to be then delivered to the grantee named in the deed, the grantor reserving no dominion or control over the deed during his lifetime, a valid delivery is thereby made, and an immediate estate is vested in the grantee subject to a life estate in the grantor."

2. When the deed was executed there was no existing legal obligation on Fred's part to compensate Clara and Edward for the years of care given Othmar. From the testimony of the attorney who drew the deed, it appears he did not at first intend to include them in the deed, but upon reflection decided to do so. After his death developments disclosed that he was obligated to his brother Charles in a large amount. This obligation arose in this way: Charles would indorse his notes in blank, and after Fred's death between $5,000 and $6,000 of these notes turned up, and Charles is still at the job of paying them off. Fred had led a pretty fast life. For several years before the death of his wife, Mary, Fred and plaintiff were, to say the least, on friendly terms. Affectionate and amorous letters written by him to her appear in the record; some of them state he is indorsing a check. She had no regular employment. The record satisfies us that his salary as bookkeeper and the rent collected was much less than the expense of his home with an invalid wife and the money he spent on plaintiff. At his death he owed outside creditors from $10,000 to $12,000. It is established beyond question that he owed his

brother Charles from $5,000 to $6,000. There was
a valid consideration for the deed.

3.   Upon this record plaintiff was an adventuress,
pure and simple. This, of course, does not place her
beyond the pale of the law. She is entitled to the
protection of her legal rights. But it does prompt
the court to scrutinize her claims and those of her
associates with a proper degree of care. As to those
things which were equally within the knowledge of
deceased, she can not testify, and such of her testi-
mony as comes within this class must be eliminated.
Counsel concede this. A lady friend of plaintiff
testifies to the occasion of the giving of the engage-
ment ring 12 days after his wife's death. Her testi-
mony has support in engravings on the ring itself,
and upon the record it may be said that it is estab-
lished that it took place on that date. But this wit-
ness does not testify that Fred made any represen-
tations as to his property, his wealth, or his income.
The only testimony of this character comes from
plaintiff herself, and, as pointed out, this testimony
we cannot consider. Some States, particularly
among the early decisions, inclined to the doctrine
that secret conveyances shortly before marriage
were *per se* fraudulent, some cases saying conclu-
sively fraudulent. This State never went so far.
Plaintiff relies on *Cranson* v. *Cranson,* 4 Mich. 230
(66 Am. Dec. 534); *Brown* v. *Bronson,* 35 Mich.
415; and *Killackey* v. *Killackey,* 166 Mich. 311. In
the *Cranson Case* the court found that the deed was
not delivered until long after the marriage, so that
the husband was seized of the land during coverture,
and that it was without consideration and actually
intended to defraud his prospective wife. The *Brown*
*Case* was very similar. In both cases the convey-
ances were voluntary ones, without consideration,

and were intended to take care of children of a former marriage in fraud of the prospective wife. In the *Cranson Case* the deed was made 14 days before the marriage, in the *Brown Case* two days before the marriage, while here it was executed over 11 months before the marriage. In the *Killackey Case* the deed was executed nearly four years after the marriage and after the parties had separated (see 156 Mich. 127).

This record establishes beyond question that when the deed was executed Fred was a sick man. As we have pointed out, he then owed Charles not only a moral but a legal obligation to compensate him for the money he had had through his indorsements and possibly otherwise. He had been a "rounder," was doubtless unfaithful to his wife, Mary, and quite likely for some time had supported plaintiff. We cannot but feel that when he made the deed in question, less than a month after Mary's death, in his then feeble health, he was somewhat chastened and realized his legal and moral obligation to his own blood, and that the deed was executed to discharge the duty he owed to them, and that the element of bad faith was wanting.

Indeed, everything appearing in this record negatives desire or intent on his part to wrong or defraud plaintiff. His letters, his checks to her, the life of ease she lived, the bills presented to his estate for jewelry and clothing bought for her in the little over a year of their married life aggregating nearly $4,000, all show his infatuation for the woman and the length he would go to satisfy her slightest whim. That he was disillusioned after his marriage is patent from what he says in his will. Possibly he had read something from Kipling. We are satisfied that an impelling sense of duty prompted him, less

than 30 days after his wife's death, and when he was not so sure how long he would live, to discharge his obligation to those of his own blood. We are not persuaded that the deed was given with intent to defraud plaintiff in any of her rights. We quote with approval the language of the supreme court of Wisconsin in *Dudley* v. *Dudley,* 76 Wis. 567 (45 N. W. 602, 8 L. R. A. 814). It was there said:

"The only remaining question of law is whether the mere noncommunication of the fact of the making of the deed establishes the transaction as a legal fraud which cannot be questioned or repelled under any circumstances. It must be admitted that there is a class of cases which hold that nothing can be shown against it except notice or information given to the intended wife, and that noncommunication is conclusive evidence of fraud. But all such cases must be understood to have been decided upon their own facts, where there was nothing to repel the presumption of fraud. But in most if not all of the recent cases, and in some not so recent, it is held that concealment or the nonexistence of communication to the intended wife or husband is not always a constructive fraud, but that it will depend upon the circumstances of each case."

In *Connelly* v. *Ford,* 202 Mich. 558, the deed was executed to the grantor's mother four days before the marriage. This court held that the deed was not fraudulent. Mr. Justice Moore, who wrote for the court, saying:

"Unless the mere fact of making the deed without telling the woman who afterwards became his wife, of his purpose to do so establishes an ulterior purpose, it is not established."

See, also, *Beckwith* v. *Beckwith,* 61 Mich. 315; *Trabbic* v. *Trabbic,* 142 Mich. 387; *Griffin* v. *Griffin,* 225

Mich. 253. In 48 L. R. A. (N. S.) at page 513, will be found an exhaustive note on this question. With the citation of numerous cases, the general rule of good faith is thus stated:

"As to antenuptial conveyances made in good faith, the general rule is that such a conveyance will defeat a claim for dower."

The decree will be affirmed, with costs of this court.

North, C. J., and Fead, Wiest, Clark, McDonald, Potter, and Sharpe, JJ., concurred.